AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Seizure of: | ) Case No. 23-3157mB |
| *(Briefly describe the property to be seized)* | ) |
| | ) |
| The contents of Mountain America Credit Union My Free Checking Account #0011839347-50, held in the name of Daniel Arroyo | ) |
| | ) |
| | ) |
| | ) |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

  An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the District of Arizona be seized as being subject to forfeiture to the United States of America. The property is described as follows:

  The contents of Mountain America Credit Union My Free Checking Account #0011839347-50, held in the name of Daniel Arroyo

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before   4/19/23
                    *(not to exceed 14 days)*

☑ in daytime - 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

  Unless delayed notice is authorized below, you must also give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

  An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to any United States Judge on criminal duty in Arizona.

  ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be search or seized *(check the appropriate box)*

    ☐ for ___ days *(not to exceed 30).* ☐ until the facts justifying, the later specific date of _____

Date and time issued:   4/5/23 @ 4:54pm     M Morrissey
                          *Judge's signature*

City and State:  Phoenix, AZ       Honorable Michael T. Morrissey, U.S. Magistrate Judge
                       *Printed name and title*

AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture

## United States District Court
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Seizure of:<br>*(Briefly describe the property to be seized)*<br><br>The contents of Mountain America Credit Union<br>My Free Checking Account #0011839347-50,<br>held in the name of Daniel Arroyo | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 23-3157 MB

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe the following property in the District of Arizona is property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity including but not limited to property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 554 (Smuggling good from the United States), 18 U.S.C. § 924(n) (Travel into or within the U.S. with intent to violate § 922(a)(1)(A)), and/or 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) subject to seizure pursuant to 18 U.S.C. § 981(b), 18 U.S.C. § 982(b)(1), 18 U.S.C. § 3051(b), 21 U.S.C. § 853(e) and (f), and 28 U.S.C. § 2461(c); and (c) subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and 982(a)(1) and 28 U.S.C. § 2461 *(describe the property)*:

The contents of Mountain America Credit Union My Free Checking Account #0011839347-50, held in the name of Daniel Arroyo

The application is based on these facts:

See the Affidavit of Bureau of Alcohol Tobacco Firearms and Explosives Special Agent Sean Patrick Sander

❑ Continued on the attached sheet.

_____
*Applicant's signature*

P. Sean Sander, Special Agent, Affiant
*Printed name and title*

Approved by AUSA
JOSEPH BOZDECH    Digitally signed by JOSEPH BOZDECH<br>Date: 2023.04.05 11:00:59 -07'00'

Sworn to telephonically and signed electronically.

Date: 4/5/23 @ 4:54pm

_____
*Judge's signature*

City and State: Phoenix, Arizona

Honorable Michael T. Morrissey, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, P. Sean Sander, being first duly sworn, deposes and states as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.    Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below:

    a.    2911 S. 95th Drive, Tolleson, AZ 85353, **(Subject Premises A-1)**, as further described in Attachment A-1;

    b.    303 E. South Mountain Ave., #60 Phoenix, AZ 85041 **(Subject Premises A-2)**, as further described in Attachment A-2;

    c.    8175 W. Ludlow Dr., Apartment #227, Peoria, AZ 85381 **(Subject Premises A-3)**, as further described in Attachment A-3;

    d.    9884 S. 117th Place, Scottsdale, AZ 85259 **(Subject Premises A-4)**, as further described in Attachment A-4;

    e.    1849 S. Power Rd. Apartment #1205 Mesa, AZ 85206 **(Subject Premise A-5)**, as further described in Attachment A-5;

    f.    2016 Toyota Tundra pickup truck, black in color, Arizona registration 69A00E, VIN ending in x8437, registered to Daniel ARROYO **(Subject Premise A-6)**, as further described in Attachment A-6;

    g.    2012 Acura sedan Model TL, Arizona registration J5A3YL, VIN ending in x2629, registered to Daniel ARROYO **(Subject Premise A-7)**, as further described in Attachment A-7; and

    h.    2017 Ford F-150 pickup truck, black in color, Arizona registration "BIGTUNA," VIN ending in x6395, registered to Nicholas LOMBARDI **(Subject Premise A-8)**, as further described in Attachment A-8.

2.     Your Affiant further makes this Affidavit in support of an application for property subject to seizure under 18 U.S.C. §§ 981(b), 982(b)(1), 3051(b), 21 U.S.C. § 853(e) and (f), and 28 U.S.C. § 2461(c), including:

    a.  Mountain America Credit Union My Free Checking Account x9347-50, held in the name of Daniel ARROYO; and

    b.  2016 Toyota Tundra pickup truck, black in color, Arizona registration 69A00E, VIN ending in x8437, registered to Daniel ARROYO (collectively, the **Subject Assets**).

3.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and I have been employed with ATF for twenty-two years. Before my employment with ATF, I was a United States Border Patrol Agent for nearly eight years.

4.     Since May 2000, I have worked as a Special Agent (SA). As a SA, I conduct criminal investigations of individuals and entities for possible violations of state and federal firearms and narcotics laws. I have been involved in many firearms, gang, and narcotics investigations, including investigations that have resulted in the arrests, searches, and seizures of individuals and property. I have participated in numerous controlled buys of firearms and narcotics from suspected traffickers. I also have used confidential informants, undercover agents, pen register/trap and trace devices, video surveillance, GPS tracking devices, search warrants, and audio surveillance, among other law enforcement techniques. I have been involved in the prosecution/enforcement of hundreds of firearms investigations over the years while employed with ATF.

5.     As a result of my training and experience, I have become knowledgeable in the methods and modes used by firearms trafficking operations, and the language and patterns used. I am aware of techniques that are used to attempt to deter and/or hinder law enforcement investigations of firearms trafficking schemes, including the utilization of multiple cellular phones, fictitious identities, web-based sales, planned distribution schemes, and the use of false and/or fictitious identities or "straw" purchasers.

6.     The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, analysis of public records; analysis of social media information; analysis of telephone records; and analysis of financial records.

7.     Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested search warrants, your Affiant has not set forth all the relevant facts known to law enforcement officers.

## II.     PROBABLE CAUSE

8.     Title 18 U.S.C. § 922(a)(1)(A), makes it is unlawful for any individual to engage in the business of dealing firearms without a federal firearms license (FFL). The requirement that a firearms dealer must be licensed is explained on every ATF Form 4473.

9.     When a person buys a firearm from an FFL, the purchaser must fill out an ATF Form 4473. This form is the official transfer record that documents the transfer of the purchased firearm(s) from the FFL to the purchaser. The purchaser must provide personal information about himself and answer a series of questions to determine if the purchaser is buying the firearms for himself and if the purchaser is a prohibited possessor.

10.     Form 4473 also contains a certification section. In that section, the form states, "I certify that my answers are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473 . . . I also understand that making any false oral or written statements or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal Law, and may also violate State and/or local law . . ." Below this paragraph is a signature and date line where the purchaser must sign and date certifying that the information provided on the form is true, correct, and complete.

11.     Based on my training, experience, and consultation with other experienced firearms trafficking investigators, numerous past and current ATF investigations firearms

are routinely purchased in the State of Arizona to be smuggled into areas with more restrictive firearm laws. I know that California and Mexico have very strict firearms laws. In Mexico, under most circumstances, it is illegal to own, possess, or carry any firearms whatsoever. Arizona has none of those restrictions.

12.     I know from my training, experience, and consultation with investigators more seasoned in firearms trafficking investigations that when people buy multiple firearms, purchase the same firearm multiple times during one single purchase or on different occasions, and pay cash, these are common signs of firearms dealing.

**A.     ARROYO**

13.     In April 2022, I was advised by an Industry Operations Investigator about several firearms purchased by an individual named Daniel Richard Martinez ARROYO from Peoria Pawn, a FFL located at 6750 W. Olive Ave #109, Peoria, AZ 85345. ARROYO had purchased several expensive belt-fed rifles which are typically trafficked to Mexico to drug cartels and other criminal organizations.

14.     I ran ARROYO through ATF databases and found a previous ATF investigation of ARROYO. On August 23, 2018, ARROYO purchased a FN M249 .556mm rifle s/n M249SA05213 from Mo Money Pawn, an FFL located in Phoenix, AZ. On or about December 16, 2018 ATF SAs interviewed ARROYO. During the interview, ARROYO admitted that he sometimes he buys and sells firearms, that he had purchased an expensive belt-fed rifle (FN M249 .556mm rifle s/n M249SA05213), and that he had sold this firearm about one month after purchasing it for profit to an unknown individual from www.armslist.com. ARROYO also told ATF SAs that he had purchased some .38 super pistols as well. ATF SAs warned ARROYO about dealing firearms without a federal firearms license and advised him of the process to obtain an FFL from ATF.

15.     From January 2021–November 2022, ARROYO purchased at least approximately **62** known firearms for approximately **$315,928**. Of those, approximately **30** were belt-fed rifles and at least **nine** were .50 caliber rifles. The .50 caliber rifles

4

generally retail at $15,000-$25,000 per firearm. ARROYO spent over **$315,928** on known firearm purchases from June 2021-June 2022.

16.     In my training and experience, I know that belt-fed and .50 caliber rifles are often trafficked to Mexico for large profits. I know that individuals purchasing more than one .50 caliber rifle are often trafficking for profit. Drug trafficking organizations and cartels covet these firearms, which they use to enforce and facilitate their criminal activity.

17.     ARROYO possesses an Arizona concealed carry weapons permit (CCW). Because he has a CCW, an FFL is not required to perform a NICS/Brady background check each time ARROYO purchases firearms. Therefore, ATF believes that ARROYO may have purchased many additional firearms that ATF is not able to locate at this time.

**B.     ARROYO'S KNOWN FIREARM PURCHASES**

18.     The following **27** firearm purchases below were made by ARROYO from Peoria Pawn, an FFL located at 6750 W. Olive Ave #109, Peoria, AZ 85345:

   a.  Purchased on 01/15/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043
      i.  Century Arms pistol Micro Draco, 7.62x39mm s/n PMK-21959-20
   b.  Purchased on 01/19/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043
      i.  Century Arms pistol Micro Draco 7.62x39mm s/n PMD-2280420
   c.  Purchased on 02/03/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043
      i.  Century Arms pistol Micro Draco 7.62x39mm s/n PMD-22576-20R
   d.  Purchased on 05/17/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043
      i.  Marcolomar UK59 rifle, 7.62x54mm s/n JK-5394
      ii.  Wiselite Arms PKM rifle 7.62x54mm s/n WLA29-GL251
      iii.  Century Arms rifle, L1A1, .308 caliber, s/n 1CL00319

5

e. Purchased on 06/07/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043

    i. Ohio Ordinance M240 SLR rifle, 7.62x51mm s/n 24018

f. Purchased on 07/19/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043

    i. Glock pistol 19x, 9mm, s/n AFTD261

    ii. Glock pistol, 43x, 9mm, s/n DUDF115

    iii. Glock pistol 45, 9mm, s/n BTYC609

g. Purchased on 07/27/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043

    i. Browning M2 .50 caliber rifle, s/n 320569

    ii. Vector Arms rifle RPD-SH 7.62x39mm s/n CT624

    iii. Mauser rifle MG42 8mm, s/n 1-27453

h. Purchased on 08/09/21 using the address of 7412 W. Cordes Rd. Phoenix, AZ 85043

    i. Glock Pistol 19 Gen 3 9mm s/n BTXD789

    ii. Heritage revolver Barkeep, .22LR s/n 1BH448850

    iii. Mossberg Shotgun 500E 12 gauge, s/n T380997

i. Purchased on 08/21/21 using the address of 7412 W. Cordes Rd. Phoenix, Az 85043

    i. Browning Arms M-2 rifle, .50 caliber, s/n 0538

    ii. Browning Arms M-2 rifle, .50 caliber s/n V0020

j. Purchased on 12/12/21 using the address of **Subject Premises A-1**:

    i. MVB SG43 rifle 7.5x54mm s/n 7777

        1. Browning Arms rifle .50 caliber s/n 20211680

    ii. Lewman Arms rifle M53 7.92mm s/n F-22391

k. Purchased on 12/27/21 using the address of **Subject Premises A-1**:

    i. FN Herstal SCAR 17S rifle, 7.62x51mm s/n HC32968

      ii.  FN Herstal SCAR 17S rifle, 7.62x51mm s/n HC57082

     iii.  FN Herstal SCAR 17S rifle, 7.62x51mm s/n HC337387

     iv.  Mauser 98 rifle .30-.06 caliber s/n 4132

  l.  Purchased on 12/31/21 using the address of **Subject Premises A-1**:

      i.  Glock Pistol Model 45 9mm, s/n BSNH196; and

      ii.  Heritage revolver Rough Rider, .22LR s/n 3PH080923.

  m.  Purchased on 02/24/22 using the address of **Subject Premises A-1**:

      i.  Colt Official Police revolver .38 special s/n 734851.

19.    For each of these purchases from Peoria Pawn, ARROYO used his cellular phone (623-451-8904) to facilitate the transactions.

20.    In addition to these purchases, I am aware that ARROYO purchased **25–30** guns from an individual from July–December 2021. These firearms included **three** Barrett .50 caliber rifles, which ARROYO purchased for approximately $12,000 each, **one** AK-style rifle, which ARROYO purchased for approximately $3,000, and approximately **20–25** AR-style rifles, the price of which I estimated to be $25,000–30,000, based on my knowledge of the current firearms market.

21.    On November 14, 2022, ARROYO purchased the following firearms from Super Pawn, an FFL located at 2701 W. Glendale Ave. Phoenix, AZ 85051, using the address of **Subject Premises A-1**:

  a.  Beretta shotgun, Model A400, 12-gauge, s/n XA054751; and

  b.  CZ pistol, Model P-10-C 9mm, s/n UA07080.

22.    ARROYO also purchased firearms and firearms parts from private individuals in Arizona using armslist.com. Information from armslist.com shows that ARROYO may have purchased 100+ firearms using this website from 2019-2022. ARROYO identified **Subject Premises A-1** as his address on his armslist.com account.

**C.   INTERVIEWS**

23.    On April 19, 2022, I spoke with the owners/operators of Peoria Pawn. ARROYO had purchased several firearms for transferred to Peoria Pawn from Patriots

Den, an FFL in St. Croix Falls, WI, including (1) Browning 1919 rifle, .30 caliber, s/n 958501; and (2) Browning M-2 rifle, .50 caliber, s/n 332569.

24.     On April 20, 2022, I spoke with ARROYO over the telephone (623-451-8904). I tried to set up a time/interview with ARROYO to speak with him about the firearms from The Patriot Den. ARROYO made excuses not to meet with ATF Agents and claimed to be divorced and to not live at **Subject Premises A-1**. ARROYO stated that he obtained a lawyer, and I offered to meet with ARROYO and his attorney to discuss his firearms, but ARROYO declined to meet.

25.     On April 20, 2022, I spoke with Ken Chinander by telephone. Chinander explained that he would build/manufacture firearms from parts/parts kits for ARROYO and that the firearms would be sold through Patriots Den. Chinander admitted that he had sold three or four .50 caliber style rifles and two .30 caliber 1919-style rifles to ARROYO in 2021/2022. Chinander explained that ARROYO was from Arizona and that ARROYO would fly to Wisconsin to facilitate these gun deals. Chinander explained that ARROYO would come out to discuss what guns he wanted manufactured with Chinander and the owner/operator of Patriots Den. ARROYO would pay by cash or a cashier's check. Chinander stated that he could remember ARROYO flying out to Wisconsin and meeting him at least three or four times to pay for these guns to be manufactured.

26.     Chinander stated that ARROYO called him about one week ago (week of April 13, 2022) to discuss manufacturing more M-2 .50 caliber rifles for him. Chinander also explained that ARROYO told him that he would shoot guns he made for him out in the desert and then "flip them"/sell them for profit.

27.     Chinander further explained that he would manufacture the belt-fed rifles and provide them to Patriots Den. ARROYO would then go to Patriots Den and complete the ATF Form 4473 and pay a transfer fee to transfer the firearm to the FFL in Arizona. Chinander stated that ARROYO through his cellular phone of 623-451-8904. Chinander provided notes detailing his firearms sales to ARROYO:

      1.  Browning M-2 .50 caliber rifle s/n 0538, paid $20,585 cash 07/20/21;

2. Browning M-2 .50 caliber rifle, s/n 320569, paid $15,500 cash 07/20/21;

3. Browning M-2 .50 caliber rifle, s/n 1176269, paid $20,585 cash 10/09/21;

4. Browning 1919 rifle, .30 caliber, s/n 498222, paid $6,800 check 10/20/21;

5. Browning 1919 rifle, .30 caliber, s/n 958501, paid $6,800 check 03/26/22;

6. Browning M-2 .50 caliber rifle, s/n 332569, paid $22,500 cash 03/26/22.

28.    I later found that the Browning M-2 rifle .50 caliber, s/n 1176269, and the Browning 1919 rifle, .30 caliber s/n 498222, were transferred to Erik Rascon from ARROYO through Tactical Studio, an FFL located at 5023 W Olive Ave. Glendale, AZ 85302. RASCON agreed to voluntarily speak with ATF SAs in May 2022. RASCON admitted that he sold the M-2 .50 caliber rifle for about $25,000, making about $5,000 in profits. RASCON sold the 1919 .30 caliber rifle for about $9,000, making about $500-$1000 in profits. RASCON admitted he approached ARROYO about obtaining some guns, and ARROYO made all the arrangements. RASCON claimed that he gave ARROYO some money and that he paid for the guns. (As explained above, ARROYO is the person who traveled to Wisconsin and purchased these guns from Patriots Den.)

29.    I also spoke to another individual who met ARROYO at Patriots Den in St Croix Falls, WI, in approximately July 2021. Timothy Dorsey stated that ARROYO was from Arizona and had flown out to Minnesota to inspect/purchase a MG-42 style rifle from him as well. Dorsey provided some text messages with ARROYO in July 2021 regarding their meeting. ARROYO used the Cellular Telephone number of 623-451-8904. Dorsey stated that ARROYO purchased the MG-42 rifle from him for $8,500 and provided a copy of a cashier's check from Mountain America Credit Union dated 07/14/21 for $8,500 from Daniel ARROYO to Timothy Dorsey. Dorsey did not know if ARROYO was selling the MG-42, but claimed it he could easily sell it, as it was worth a lot of money.

30.    On July 6, 2022, I spoke with Serhiy Varydova over the telephone regarding a .50 caliber rifle that he had sold in 2021. Varydova stated that this firearm was a "Ma Deuce" M-2 .50 caliber rifle with the serial number of V0020 along with some parts. Varydova could not remember the purchaser's name but did remember that he met him on

www.gunbroker.com. Varydova stated that this purchaser flew from Arizona to Kentucky to see the rifles and then made the purchase in cash. Varydova stated that he then shipped the rifles to Peoria Pawn in Peoria, AZ. ARROYO purchased a M-2 Browning 50 caliber rifle, s/n V0020 and a .50 caliber receiver/parts kit s/n 0538 from Varydova for $15,600. Varydova described a person who matched ARROYO's description, and I reviewed the firearms records from gunbroker.com and Peoria Pawn, and confirmed that Varydova sold this firearm to ARROYO.

31.    On July 13, 2022, I spoke with Jarod Lewman of Lewman Arms, a FFL/manufacturer in Lakeland, FL. Lewman confirmed the sale of two belt-fed M53 Lewman rifles, 7.92 caliber, to ARROYO via Peoria Pawn in December 2021.

32.    On July 16, 2022, I spoke with James Coots of Summit Ordinance, a FFL in Clinton, OH. Coots stated that he met ARROYO through www.gunbroker.com. Coots stated that ARROYO flew to Ohio to view and inspect a .50 caliber rifle and other guns/parts in approximately December 2021. Coots stated that ARROYO was from Arizona and that he insisted on coming to Ohio to inspect/purchase the firearm. Coots stated that ARROYO purchased a Browning M-2 rifle, .50 caliber s/n 2021680 for $20,000, and a MWB SG-43 rifle, 7.5x54mm s/n 7777 for $15,000. Coots stated that ARROYO also purchased gun parts for M134 Mini Guns, MAG58/M240 rifle parts, 1919 rifle parts, and MG42 rifle parts. Coots stated that ARROYO paid cash and cashier's checks for the guns and gun parts. Coots remembered ARROYO paying him a large amount of cash for the rifles in December 2021. Coots received at least $51,300 in cashier's checks from ARROYO from December 2021–June 2022. Coots stated that on June 23, 2022, ARROYO paid him $16,000 for various gun parts kits listed above. Coots was asked about a Mountain America Credit Union Cashier's Check #8877213 dated December 6, 2021, to James Coots from ARROYO in the amount of $7,350 with a memo line that read "TRUCK PARTS." Coots stated that he never sold ARROYO any truck parts and that this check was for the purchase of a gun (M-2 Browning, .50 caliber rifle or the SG43 rifle).

33.    During the week of July 14, 2022, COOTS advised that ARROYO had inquired if COOTS had any more M-2 .50 caliber rifles for sale at this time. COOTS stated that ARROYO had contacted him using his cellular phone 623-451-8904

34.    In July 2022, ATF identified the following cashier's checks from Mountain America Credit Union My Free Checking Account x9347-50 in the name Daniel ARROYO at **Subject Premises A-1**. All the checks but one were payments for firearms. Most of these payments were made in Wisconsin and Ohio where ARROYO hand-delivered payment.

| Check | Payee | Issue Date | Amount |
|---|---|---|---|
| 01-0008606863 | STEVEN KURZWEIL | 06/25/2021 | 7,906.85 |
| 01-0008639543 | TIMOTHY M. DORSEY | 07/14/2021 | 8,500.00 |
| 01-0008796760 | KEN CHINANDER | 10/20/2021 | 7,350.00 |
| 01-0008796918 | MOXI APARTMENTS | 10/20/2021 | 3,098.38 |
| 01-0008877213 | JAMES COOTS | 12/06/2021 | 7,600.00 |
| 01-0008879104 | JAMES COOTS | 12/07/2021 | 10,000.00 |
| 01-0008930266 | JAMES COOTS | 01/10/2022 | 5,000.00 |
| 01-0008934626 | JAMES COOTS | 01/12/2022 | 7,300.00 |
| 01-0009002112 | JAMES COOTS | 02/24/2022 | 5,400.00 |
| 01-0009055609 | KEN CHINANDER | 03/24/2022 | 6,800.00 |
| 01-0009055610 | KEN CHINANDER | 03/24/2022 | 2,500.00 |
| 01-0009217302 | IMPERIAL PFS | 06/23/2022 | 1,875.98 |
| 01-0009217303 | JAMES COOTS | 06/23/2022 | 16,000.00 |

35.    On July 18, 2022, I again spoke with Ken Chinander over the telephone. Chinander was asked about some firearms he had manufactured for ARROYO. Chinander stated that in October 2021, ARROYO flew to Wisconsin to purchase a Browning M-2 .50 caliber rifle, s/n 1176269 and a Browning 1919 rifle .30 caliber s/n 498222. Chinander remembered these firearms and stated that they were actually for ARROYO'S friend "Erik Mel" (Erik Melendez RASCON). Chinander claimed that this M-2 rifle was sold to ARROYO for $20,585 cash. Chinander stated that the Browning 1919 rifle was sold to ARROYO for $6,800 by cashier's check.

36.    Chinander was asked about cashier's check #8796760 dated 10/21/21 from Mountain America Credit Union from Daniel ARROYO to Ken Chinander in the amount of $7,350, listed in the foregoing table. The check had a memo line stating, "Purchase of a semi-trailer." Chinander remembered this check from ARROYO and stated that it was for the Browning 1919 rifle he had manufactured for RASCON/ARROYO. Chinander stated

that he never sold ARROYO a "semi-trailer," and that this check and all the other money was for guns only. Chinander had no answer as to why ARRROYO indicated this money was for a semi-trailer when it was actually for a rifle.

37.    Chinander also stated that ARROYO had called at the end June 2022/July 2022). Chinander stated that ARROYO asked him about the ATF investigation and if Chinander had any information about it. Chinander claimed that he told ARROYO nothing about his conversations with me. At that time, ARROYO stated that he was sorry for any headaches the ATF investigation may have caused Chinander. ARROYO asked Chinander if he had any more M-2 .50 caliber rifles for sale and told Chinander that he (ARROYO) had been "cleared" of any wrongdoing by ATF.

38.    On July 20, 2022, I spoke with Steven Kurzweil, who stated that in June or July 2021, he had advertised a Vector Arms RPD-SA rifle, 7.62x39mm, s/n 00062, on www.gunbroker.com. (According to Peoria Pawn, this firearm had the serial number CT624). Kurzweil stated that this firearm was sold to a Daniel ARROYO on for $7,906.85. Mountain America Credit Union shows a Cashier's Check #860006863 dated June 25, 2021, from Daniel ARROYO to Steven Kurzweil. Kurzweil shipped the gun to Peoria Pawn on or about July 1, 2021. The firearm was then transferred to ARROYO from Peoria Pawn on or about July 27, 2021.

39.    On July 21, 2022, I spoke to Henry Fusaro and his lawyer. Fusaro admitted that he sold three FN Herstal SCAR rifles, 7.62x39mm, s/n HC33738, HC57082 and HC32968 for approximately $5,000 per firearm to ARROYO. Fusaro identified ARROYO by photograph.

40.    Fusaro's attorney later contacted me and conveyed that Fusaro had sold ARROYO 25–30 firearms from July–December 2021. FUSARO stated that all of the 25-30 firearms were rifles. One of the rifles was an AK-style rifle sold to ARROYO for approximately $3,000. FUSARO also sold ARROYO at least three Barrett .50 caliber rifles for approximately $12,000 each, $36,000 total. The other 20-25 rifles were AR-style rifles. By Fusaro's numbers and my estimation, ARROYO purchased approximately $77,000–

$82,000 of firearms from Fusaro in six months. According to Fusaro, ARROYO contacted/texted Fusaro using his cell phone 623-451-8904.

41.    In July 2022, I reviewed records from www.gunbroker.com regarding ARROYO's account, which has a listed address of **Subject Premises A-1**. This account shows purchases of firearms and gun parts in 2021 and 2022 and includes purchases from James Coots/Summit Ordnance.

42.    ATF is aware from reports by FFLs that ARROYO has continued to engage with them regarding the potential purchase of firearms since July 2022. In addition, ARROYO complained to an FFL about ATF's investigation of him around the time that I attempted to speak with ARROYO in April 2022. ARROYO also told an FFL that he had another FFL (likely a home-based FFL) who was still selling him guns.

### D.    LOMBARDI

43.    On October 18, 2022, Magistrate Judge Deborah Fine issued a tracking warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. Section 2703(c)(1)(A) to obtain location information for ARROYO's cellular telephone. On the same day, Judge Fine issued a search warrant for historical call detail records of ARROYO's cellular telephone. Both warrants have been extended or reissued three times.

44.    On March 14, 2023, Your Honor issued a tracking warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. Section 2703(c)(1)(A) to obtain information about the location of LOMBARDI's cellular telephone. On the same day, Your Honor also issued a search warrant for historical call detail records of LOMBARDI's cellular telephone.

45.    The data provided pursuant to these search warrants resulted in ATF identifying potential co-conspirators of ARROYO, including an individual named Nicholas LOMBARDI.

46.    ARROYO and LOMBARDI traveled on the same flight reservation as ARROYO from Phoenix, AZ, to Columbus, OH, on August 29, 2022, returning September 1, 2022. While in Ohio, LOMBARDI sent two packages to Arizona via FedEx T to a

friend/acquaintance of LOMBARDI in Queen Creek, AZ. The first package was a 3-piece package weighing 142.7 lbs., the second was a single package weighing 52.5 lbs. ATF obtained confirmation from FedEx that it delivered both packages.

47.     ARROYO is also known to have traveled to Ohio on prior occasions. On those trips, ARROYO purchased firearms and firearms parts, including from an individual named James Coots, who resides in Ohio and is discussed below.

48.     ARROYO and LOMBARDI contacted one another approximately 163 times by telephone from October 2021 to March 2023.

49.     Between on or about January 7, 2022, to about July 28, 2022, ARROYO made peer to peer transfers of $1,435 to LOMBARDI using Apple Cash.

50.     In February 2023, I spoke with an individual named James Coots, who resides in Ohio. Coots admitted that LOMBARDI had inquired about purchasing an M134 Mini Gun motor from Coots in July 2022. LOMBARDI paid $8448 to Coots via a Chase Cashier's Check #9015754739 dated July 6, 2022. Coots claimed that he cashed the check but returned the money to LOMBARDI one or two weeks later because LOMBARDI no longer wanted the mini gun motor. Coots had no explanation as to why LOMBARDI no longer wanted the motor. I know from previous conversations with Coots that ARROYO purchased M134 Mini Gun parts and belt-fed rifles from Coots in 2022.

**E.     LOMBARDI'S FIREARM PURCHASES**

51.     LOMBARDI purchased these firearms from the FFL Bear Arms in Scottsdale, AZ, on the following dates:

   a.   June 5, 2022: Ruger pistol, Model 57, 5.7x28mm, s/n 641-70584;

   b.   June 5, 2022: Taurus pistol, Model 1911 P7, 9mm, s/n ACD809479; and

   c.   September 3, 2022: Glock pistol, Model 43x, 9mm, s/n BXBZ215.

52.     LOMBARDI purchased these firearms, receivers, and silencers from the FFL East Valley Tactical/Mr. Silencer in Mesa, AZ, on the following dates:

   a.   12/20/20 Ruger rifle, Model AR-556, 5.56mm, s/n 858-68726;

   b.   1/18/21, Beretta pistol, Model APX, 9mm, s/n A113023X;

14

   c. 2/22/21, SCCY pistol, Model CPX-2TTRD, 9mm, s/n C093719;

   d. 2/22/21, SCCY pistol, Model CPX-2TT, 9mm, s/n C093180;

   e. 2/22/21, Beretta pistol, Model APX, 9mm, s/n A113217X;

   f. 4/27/21, Palmetto State Armory receiver, Model PA-15, multi caliber, s/n SCD731049;

   g. 6/02/21, Palmetto State Armory receiver, Model AR-15, Safe/Stripped multi caliber, s/n SCD71641;

   h. 8/17/22, Rugged Suppressor Silencer, Model 7.62x51mm, s/n KCAR-4027;

   i. 8/17/22, Palmetto State Armory rifle, Model PA-15, multi caliber, s/n SCD926562;

   j. 8/17/22, Aero Precision receiver, Model M4E1, multi caliber, s/n 21316588;

   k. 8/17/22, Palmetto State Armory pistol, Model AK-P7, 7.62x39mm, s/n P7-016001;

   l. 8/17/22, Century Arms rifle, Model WASR-10UF, 7.62x39mm, s/n 22UF-5687;

   m. 8/27/22, Palmetto State Armory rifle, Model PSAK47, 7.62x39mm, s/n AKB078283;

   n. 8/27/22, Palmetto State Armory Model PSAK47, 7.62x39mm, s/n AKB077695;

   o. 8/27/22, Palmetto State Armory rifle, Model PSAK47 s/n AKB077669;

   p. 9/22/22, Palmetto State Armory rifle, Model GF3, 7.62x39mm, s/n RPK001235.

53.    LOMBARDI purchased these firearms and receivers from the FFL Jeff Clark LLC dba Tactical Armory in Phoenix, Arizona, on the following dates:

   a. 8/26/22, Barrett rifle, Model 82A1, .50 caliber, s/n AA014595; and

     b.  12/14/22, Palmetto State Armory receiver, PA-15, Multi caliber, s/n SCB307545.

54.    On the ATF Form 4473s for each of these purchases, LOMBARDI listed his address as **Subject Premises A-4**.

55.    LOMBARDI possesses an Arizona concealed carry weapons permit (CCW). Because he has a CCW, an FFL is not required to perform a NICS/Brady background check each time LOMBARDI purchases firearms. Therefore, ATF believes that LOMBARDI may have purchased many additional firearms that ATF is not able to locate at this time.

56.    In October 2022, I contacted the company www.beltfeds.com, which sells large belt-fed rifles and machine guns such as M2 .50 calibers, M240s, M249s, M60s, and M134 Mini Guns. The M134 Mini Gun is military machine gun typically 7.62x51mm (.308 caliber) with a rapid rate of fire typically between 3,000-6,000 rounds of ammunition a minute. It is a Gatling-style 6-barrel rotating barrel assembly that uses an external power source such as an electric motor. According to Beltfeds, LOMBARDI purchased a total of **$152,833.99** worth of M134 Mini Gun parts kits in March 2022 and November 2022. LOMBARDI listed a home/shipping address of **Subject Premises A-4** and used cellular telephone number of 480-292-5845. Beltfeds advised ATF that they shipped all the packages to **Subject Premises A-4**:

     a.  M134 Mini Gun Parts purchase on 03/05/22 for **$684.42;**

     b.  M134 Mini Gun Parts kit purchase on 03/07/22 for **$4,438.73;**

     c.  M134 Mini Gun Parts kit purchase on 03/09/22 for **$78,310.84; and**

     d.  M134 Mini Gun Parts kit purchase on 11/11/22 for **$69,400.**

57.    According to MG Armory, an FFL in Hollywood, FL, from May-October 2022, LOMBARDI purchased approximately **$98,750** in firearms and firearms parts kits listed below. LOMBARDI provided the cellular telephone number 480-292-5845 and an address of **Subject Premises A-4**. MG Armory advised ATF that it shipped all of these packages to **Subject Premises A-4**:

     a.  Purchased 5/31/22 Invoice #235 for $16,000 for a Delinker;

    b. Purchased 6/09/22 Invoice #252 for $14,000 for G.C.U.;

    c. Purchased 6/09/22 Invoice #255 for $19,500 for Bolts, Motor, Misc.;

    d. Purchased 9/29/22 Invoice #220 for $25,750 for Misc. Parts;

    e. Purchased 10/01/22 Invoice# 275 for $12,500 for Geared Motor; and

    f. Purchased 10/03/22 Invoice# 280 for Motor no gear $11,000.

58.    LOMBARDI also purchased firearms, firearm parts/kits, and ammunition from these retail outlets:

    a. Target Sports:    Ammunition in the amount of $77,507;

    b. Outdoor Limited:    Ammunition, etc., in the amount of $15,511;

    c. Guns.com:    Firearms and ammunition in the amount of $15,155;

    d. East Valley Tactical:    Firearms in the amount of $11,662;

    e. Magnum Ballistics:    Ammunition, etc., in the amount of $10,265;

    f. LAX Firing Range:    Ammunition in the amount of $10,100; and

    g. Cheaper than Dirt:    Ammunition in the amount of $8,735.

59.    LOMBARDI purchased **$251,583** in M134 Mini Gun Parts Kits alone in 2022. Individuals who buy firearms parts kits many times are looking to manufacture and build these into to operating rifles and machine guns. These operating firearms can then be sold for large profits especially to criminal organizations and drug cartels in Mexico.

60.    LOMBARDI also purchased firearms and firearms parts from private individuals in Arizona in August 2022 using www.armslist.com. LOMBARDI identified his telephone number as 480-292-5845 and **Subject Premises A-4** as his address on his armslist.com account. According to Armslist records, LOMBARDI purchased at least one Barrett .50 caliber rifle along with parts kits and ammunition.

61.    LOMBARDI also purchased at least two Rare Breed Triggers from two private individuals in August 2022 using www.gunbroker.com in August 2022. Rare Breed Triggers are "machine gun conversion devices," which convert semi-automatic firearms into fully automatic firearms. They are illegal to possess unless they have been registered with the ATF National Firearms Act (NFA) Branch.

62.     LOMBARDI has one silencer and zero machine gun conversion devices registered with the ATF NFA Branch.

63.     In August 2022, I interviewed a Crystal and Armando Sosa. The Sosas stated that ARROYO contacted them through www.armslist.com and using his cellular telephone number 623-451-8904 to purchase a firearm. In August 2022, ARROYO met the Sosas and paid approximately $1500 to purchase an AK-style firearm from them. At that time, ARROYO told the Sosas that he would buy as many AK rifles as they could get and to contact him whenever they had more. The Sosas noted that ARROYO carried a large amount of cash, which he used to pay for the AK style rifle.

64.     In January 2023, ARROYO contacted an individual named Andrew Steblein about firearms. Steblein told ATF that he met ARROYO through armslist.com and that he had sold ARROYO a Kalshnikov 9mm AK-style rifle on January 9, 2023. Steblein identified ARROYO from a photograph and stated that ARROYO used telephone number 623-451-8904.

**F.     INTERNATIONAL TRAVEL**

65.     On January 13, 2023, ARROYO's phone pings indicated that he drove from Arizona to San Diego, CA and crossed the San Ysidro Port of Entry into Mexico. On January 15, 2023, ARROYO crossed through the San Ysidro Port of Entry into California in **Subject Premises A-6**, the Toyota Tundra. This crossing was four days after ARROYO purchased at least one AK-style rifle (Kalishnikov 9mm from Steblein).

66.     On October 6, 2022, ARROYO and his wife entered the United States from Mexico in **Subject Premises A-6**, the Toyota Tundra, at the San Ysidro, California, Point of Entry (POE).

67.     Records show that ARROYO's crossing history changed substantially in 2021 and 2022. ARROYO crossed into the United States from Mexico once in 2007, and once in 2019, nine times in 2021, and ten times in 2022. In the last 12 months, ARROYO has crossed into the United States from Mexico via the San Ysidro, CA, POE on 10 occasions, once via the Otay Mesa, CA, POE, and twice via the Lukeville, Arizona, POE.

68.     ATF has not identified any crossings into or returning from Mexico by LOMBARDI at this time.

G.     **FINANCIAL INVESTIGATION**

69.     According to Accurint Database, an individual named Robert GONZALES was listed as a previous registrant/owner of **Subject Premises A-6**, the Toyota Tundra. In March 2023, I spoke with GONZALES and asked if he ever owned or possessed a 2016 Toyota Tundra to which he stated, "yes but that he had sold it in 2021." GONZALES stated that his Tundra was black in color and was lifted with some specialty wheels with a crew cab, 4 doors, and was a Model Limited.

70.     GONZALES admitted that he didn't recall the buyer's name. He stated that he met the buyer through the website www.offerup.com. He stated that the buyer had a name or nickname of "Chino." SA Sander knows that ARROYO frequently used the nickname of "El Chino or Chino." GONZALES described the buyer as looking Hispanic, but thought he was part Asian as well. He stated that he thought it was strange, but the buyer paid him $45,000 in cash to him for the Tundra in 2021. There is no known lien on **Subject Premises A-6**, the Toyota Tundra.

71.     Desert Financial Credit Union (DFCU) Free Checking Account x9399-376279 was opened on or around August 28, 2009, by joint owners Gabriela Rocha GAYTAN and Daniel Richard Martinez ARROYO. Between on or about January 26, 2021, to on or about July 25, 2022, account x9399-376279 received cash deposits from an unknown source or sources totaling approximately $180,000. No single cash deposit exceeded $10,000. Deposits spanned $1,000-$10,000, with $5,000 being the most frequently deposited amount.

72.     DFCU Free Checking Account x6563-0400 was opened on or around April 8, 2019, by sole owner Daniel Richard Martinez ARROYO. From approximately January 6, 2021-August 05, 2022, account x6563-0400 received cash deposits from an unknown source or sources totaling approximately $184,000. No cash deposit exceeded $10,000. Deposits were $1,000-$10,000, with $5,000 being the most frequently deposited amount.

73.     Electronic transfers were observed between DFCU accounts x9399-376279 and x6563-0400.

74.     Mountain America Credit Union (MACU) My Free Checking Account x9347-50 was opened on or around January 17, 2020, by Daniel ARROYO. Between on or about January 01, 2021, to on or about February 28, 2023, account x9347-50 received cash deposits from an unknown source or sources totaling approximately $157,000. Only one cash deposit, in the amount of $11,000, exceeded $10,000. Cashier's checks for the purchase of firearms were paid out of this account as discussed above in Paragraph 34 of this affidavit. Some cashier's checks included false or misleading information regarding their purpose, as discussed in Paragraphs 32 and 36.

75.     On or around April 22, 2021, ARROYO deposited $11,000 in cash to MACU acct. x9347-50. The account balance prior to this deposit was $115.09. A debit card linked to the account was used to make a purchase in the amount of $10,630.51 from merchant "Original AK" on the same date. The purchase from Original AK included the purchase of a Marcolomar UK59 rifle, 7.62x54mm s/n JK-5394, which ARROYO purchased on May 17, 2021, from Peoria Pawn, as previously documented in paragraph 18 of this affidavit.

76.     On or around April 28, 2021, ARROYO deposited $10,000 in cash to MACU acct. x9347-50. The account balance prior to this deposit was $344.51. A debit card linked to the account was used to make a purchase in the amount of $10,000 from merchant "The Gun Crew LLC" on the same date.

77.     The July 2021 MACU bank statement for acct. x9347-50 includes a comment that reads, "MEMBER VOIDS 2 DEPOSITS DUE TO CTR REQ." This comment is included with a transaction dated on or around July 14, 2021, in which a cashier's check to Timothy M. Dorsey and in the amount of $8,500 was purchased by ARROYO. Timothy M. Dorsey sold firearms to ARROYO, as discussed in Paragraph 29 of this affidavit.

78.     ATF believes that "CTR REQ" is believed to refer to the requirement that financial institutions file a "currency transaction report" for each deposit, withdrawal, or

exchange of currency, or other payment in currency of more than $10,000 by, through, or to such financial institutions.

79.    On or around August 26, 2022, a $50,000 check from Gardenia Events LLC with a memo that reads, "PARTS", was deposited to MACU account x9347-50. Two JPMorgan Chase cashier's checks, totaling $25,000, and dated August 26, 2022, from remitter "ROGELIO FLORES" were included in the same deposit. These deposits were made three days prior to the trip ARROYO and LOMBARDI took to Ohio, and six days prior to the San Diego firearm seizure documented in paragraph 100 of this affidavit that included firearms purchased by ARROYO and LOMBARDI.

80.    According to the Arizona Corporation Commission website, Kina Trucking, LLC was organized in August 2021. ARROYO is listed as the organization's manager, while Ricardo Benavides is listed as the organization's member.

81.    A query of the United States Department of Transportation website returned no results for Kina Trucking LLC in Arizona.

82.    Desert Financial Credit Union account x5850 for Kina Trucking LLC was opened on or around December 04, 2021, by joint owners Daniel Richard Martinez ARROYO and Ricardo Benavides. Account statements show total deposits and withdrawals of approximately $48,000, with no activity reported after March 7, 2022.

83.    As of March 24, 2023, the last wages reported for Gabriela Rocha GAYTAN through the Arizona Department of Economic Security were $2,931.22 for the third quarter of 2021.

84.    As of March 24, 2023, the last wages reported for Daniel ARROYO through the Arizona Department of Economic Security were $3,400 for the first quarter of 2021.

85.    As of March 24, 2023, the last wages reported for Nicholas LOMBARDI through the Arizona Department of Economic Security were $6,511.89 for the fourth quarter of 2022. Those wages were reported by Kohl's Department Stores, Inc., who later confirmed that LOMBARDI's employment was terminated in November 2022.

## H.    SUBJECT PREMISES

86.    ARROYO is believed to maintain three households: **Subject Premises A-1**, **Subject Premises A-2**, and **Subject Premises A-3**. ARROYO owns **Subject Premises A-1** with his wife Gabriela Rocha Gaytan. ARROYO is the sole owner of **Subject Premises A-2**, which he maintains with a suspected girlfriend. ARROYO is the sole lessee of **Subject Premises A-3**. ARROYO receives mail at all three residences. ARROYO has frequented all three residences in 2023 on a near-weekly basis.

87.    LOMBARDI is believed to frequent two residences. LOMBARDI's trust owns **Subject Premises A-4**. LOMBARDI is the sole lessee of **Subject Premises A-5**. LOMBARDI previously resided at **Subject Premise A-4**. He currently receives mail and packages there and may still reside there. LOMBARDI used **Subject Premises A-4** on ATF Form 4473s in 2022 and continues to use that address on armslist.com and for his vehicle registrations. LOMBARDI's mother and possible sister may reside at **Subject Premises A-4**. LOMBARDI also currently receives mail at **Subject Premises A-5**. LOMBARDI has been at or near **Subject Premises A-4** consistently throughout March 2023; and has been at or near **Subject Premises A-5** on a few occasions in March 2023.

88.    In March 2023, I queried www.maricopacountyassessor.com and found:

    i.   **Subject Premises A-1** is owned by Daniel ARROYO and Gabriela G. ROCHA;

    ii.  **Subject Premises A-2** is owned by Daniel ARROYO; and

    iii. **Subject Premises A-4** is owned by the Daniel LOMBARDI Revocable trust.

89.    In February 2023, ATF queried the Arizona Department of Motor Vehicles and found that:

    i.   ARROYO has three registered vehicles listed to him at **Subject Premises A-1**, including **Subject Premises A-6**, the Toyota Tundra, and **Subject Premises A-7**, the Acura TL; and

ii. LOMBARDI two vehicles currently registered to him at Subject Premises A-4: a 2022 Honda Accord and **Subject Premises A-8**, the Ford F-150.

90.     On March 3, 2023, I contacted the management of **Subject Premises A-2**, Casa De Francisco Mobile Community. According to the leasing manager, some homes at the community are leased and some are owned, and ARROYO resides at **Subject Premises A-2** with a woman different than his wife, who is believed to be his girlfriend.

91.     In March 2023, I contacted the management of **Subject Premises A-3**, the Villa Vita Apartments. I reviewed the lease agreement and application for **Subject Premises A-3**, which has been leased to ARROYO from January 2023-March 2024. On the application, ARROYO listed **Subject Premises A-6**, the Toyota Tundra, and stated that his monthly salary was $20,000.

92.     ARROYO's phone pings indicate that ARROYO:

i. Has been at or near **Subject Premises A-1** in 2022 and 2023;

ii. Has been at or near **Subject Premises A-1** on March 3-4, 2023;

iii. Has been at or near **Subject Premises A-2** during the week of March 8, 2023; and

iv. Spent the night at **Subject Premises A-2** at least 1-2 nights the week of March 8, 2023.

93.     LOMBARDI's phone pings indicate that LOMBARDI:

i. Has been at or near **Subject Premises A-4** consistently throughout March 2023; and

ii. Has been at or near **Subject Premises A-5** on at least a few occasions in March 2023.

94.     On March 4th, 2023, I drove by **Subject Premises A-1** and saw **Subject Premises A-7**, the Acura TL, parked in the driveway.

95.     **Subject Premises A-6**, the Toyota Tundra, was seen on a LPR Plate reader at I-10 and N 91st Avenue, near **Subject Premises A-1** on August 21, 2022.

23

96.     In March 2023, according to U.S. Postal Service:

      i.   ARROYO currently receives mail at both **Subject Premises A-1** and **Subject Premises A-2**;

      ii.   ARROYO is also currently receiving mail at **Subject Premises A-3**;

      iii.   Nicholas LOMBARDI and Wendy Lombardi currently receive mail at **Subject Premises A-4**; and

      iv.   LOMBARDI also currently receives mail at **Subject Premises A-5.**

97.     According to the mortgage company, ARROYO and Gabriela ROCHA are currently on the mortgage for **Subject Premises A-1**. As of February 2023, ARROYO and ROCHA had been making their payments on this mortgage.

98.     ARROYO and Gabriela ROCHA currently share bank accounts through Desert Financial Credit Union with a listed address of **Subject Premises A-1**.

99.     During the weeks of March 16, 2023, March 23, 2023, and April 1, 2023, I saw **Subject Premises A-8**, Ford F-150, parked in front of **Subject Premises A-5.**

## I.    FIREARM RECOVERIES

100.     Law enforcement has recovered a number of firearms originally purchased by ARROYO and LOMBARDI. Such recoveries are also indicators of firearms trafficking and other criminal activities by the purchasers:

    a.  On August 5, 2022, ARROYO met with Crystal and Armando SOSA and purchased a Romarm/Cugir WSAR-10 rifle, 7.62x39mm, s/n 22A1-94070. This firearm was recovered on 09/01/22 by ATF San Diego U.S. Border Patrol, and San Diego Sheriff's Dept. The **time to crime was 27 days.**

    b.  On August 5, 2022, ARROYO met with Brandon ESCHER and purchased a Romarm/Cugir rifle, WASR-10, 7.62x39mm, s/n 22A1-93139. This firearm was recovered on 09/01/22, by San Diego ATF, U.S. Border Patrol, and San Diego Sheriff's Dept. The **time to crime was 27 days.**

    c.  On August 17, 2022, LOMBARDI purchased from Mr. Silencer/East Valley Tactical, a Romarm/Cugir WASR-10, 7.62x39mm, s/n 22UF-5687. This firearm was recovered on 09/01/22 by San Diego ATF, U.S. Border Patrol, and San Diego Sheriff's Dept. The **time to crime was 15 days.**

d.  On August 17, 2022, LOMBARDI purchased from Mr. Silencer/East Valley Tactical, a Palmetto State Armory rifle, Model AK-P7, 7.62x39mm, s/n P7-016001. This firearm was recovered on 09/01/22 by San Diego ATF, U.S. Border Patrol, and San Diego Sheriff's Dept. The **time to crime was 15 days.**

Three of these four firearms were of the same make and model. All four were purchased within two weeks by ARROYO and LOMBARDI. All four were recovered 2-4 weeks after purchase in the same load bound for Mexico as part of Operation Frozen Tundra. Law enforcement observed two individuals cross the international border coming from Mexico into the United States via the San Ysidro Port of Entry. San Diego Sheriff's Dept. and San Diego ATF interviewed the two suspects, who were arrested with the above firearms. At least one of the individuals admitted that they crossed the border from Mexico and were going to take the above firearms and other firearms to Mexico. Approximately 40+ firearms/rifles and large amounts of ammunition were seized in this investigation.

e.  On February 22, 2021, LOMBARDI purchased a SCCY pistol, Model CPX-2TT, 9mm, s/n C093180 from Mr. Silencer/East Valley Tactical. This firearm was recovered in Los Angeles, CA on 08/23/01. The **time to crime was 180 days**.

f.  On August, 23, 2018, ARROYO purchased a FN M249 rifle, 5.56mm s/n M249SA052123 from Mo Money Pawn in Phoenix, AZ. On 10/25/22, this firearm was recovered by Mexican law enforcement in Ocotlan, Jalisco, Mexico. The **time to crime was 1524 days**.

Multiple recoveries by law enforcement in other states and countries is a strong indicator of firearms trafficking.

g.  On June 2, 2017, ARROYO purchased a Canik pistol, Model TP-9SF, 9mm, s/n 17AT037890 from Sportsman's Warehouse, an FFL in Avondale, AZ. This firearm was recovered in Los Angeles Police Harbor Division in August 2019 in the possession of a convicted felon. The **time to crime was 790 days**.

**J.     SUMMARY OF INVESTIGATION**

101.   Neither ARROYO nor LOMBARDI are prohibited from possessing firearms.

102.   Neither ARROYO nor LOMBARDI have or have ever had an FFL.

103.   Neither ARROYO or LOMBARDI have an export license to transport/ship/send firearms and or ammunition out of the United States.

104.   LOMBARDI and ARROYO have purchased multiples of the same/similar firearm multiple times on the same occasion and on different occasions.

105.   ARROYO and LOMBARDI have mutual contacts/FFLs for purchases. They communicate frequently by telephone. ARROYO and LOMBARDI purchased firearms around the same time in August 2022. Those firearms were then recovered together by law enforcement in September 2022 on their way to Mexico. ARROYO and LOMBARDI traveled together in August 2022 to make firearms/firearms parts purchases. ATF believes that they LOMBARDI then shipped some of the purchased firearms/firearms parts to Arizona from Ohio.

106.   ARROYO and LOMBARDI have no known employment. Both have unexplained frequent/monthly cash deposits into their bank accounts. In addition, ARROYO's wife, Gabriela Rocha Gaytan, has no known employment, but receives cash deposits into her bank account.

107.   Despite being unemployed, ARROYO purchased Subject Premises A-6, the Toyota Tundra with $45,000 in cash. ATF believes that ARROYO paid for this vehicle with proceeds from his firearms sales in November 2021. ATF believes that ARROYO and Gabriela ROCHA-GAYTAN are comingling money from firearms proceeds into their bank accounts.

108.   Individuals with low earnings who purchases large amounts of firearms and accessories is an indicator of firearms trafficking.

109.   Criminal suspects purchase belt-fed rifles because they are highly profitable. They purchase the same/similar types of firearms which can be trafficked or sold for large profits. Such individuals put profits made from illegal firearms sales into vehicles, jewelry/watches, properties, and other forms of currency.

110.   Criminal suspects use Arizona Concealed Weapons Permits to keep their purchases undetected by law enforcement as no background check is needed.

111.   Individuals in this investigation have reported that ARROYO has stated that he is selling these firearms for profit.

112.    LOMBARDI purchased two machine gun conversion devices (Rare Breed Triggers) in August 2022. These conversion kits must be registered through the ATF NFA Branch in order to be possessed or sold. As noted above, LOMBARDI does not have any machine gun conversion devices registered with the NFA Branch.

## III.    ITEMS TO BE SEIZED

113.    Based upon the facts in this Affidavit, your Affiant submits there is probable cause to believe that the items in Attachment B will be found at the **Subject Premises**.

114.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Firearms traffickers often keep large amounts of United States currency on hand in order to maintain and finance their ongoing trafficking activities. Traffickers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for traffickers to possess gun proceeds and items purchased with proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of firearms traffickers.

b.    Witnesses in this investigation have noted that ARROYO has large wads/amounts of cash in his possession when conducting firearms transactions. Both ARROYO and LOMBARDI have each spent $300,000- $400,000 on firearms and firearms parts kits from 2021--2023.

c.    Both ARROYO and LOMBARDI have many cash deposits into their bank accounts and little employment history and documented income.

d.    Firearms traffickers commonly maintain firearms and weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles. In addition, other firearm-related items, such as gun pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging, targets, expended pieces of lead, photographs of firearms, and paperwork showing the purchase,

storage, disposition, or dominion and control over firearms, ammunition, and related items are commonly possessed by firearms traffickers along with their firearms. Your Affiant knows that such records, including records of any money laundering activities, are commonly maintained for long periods of time and therefore are likely to be found at the **Subject Premises**. Firearms traffickers often create and maintain notes, ledgers, receipts, and invoices for the purchase and sale of firearms.

115. Firearms traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other traffickers and customers about firearms-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, firearms traffickers commonly use other capabilities of computers and electronic devices to further their firearms trafficking and money laundering activities. Therefore, evidence related to firearms trafficking activity and money laundering activity is likely to be found on electronic storage media found at the Subject Premises, as further described below.

116. In addition, based on the facts above, your Affiant has reason to believe that cellular telephones were used to commit the offenses described herein, and therefore those electronic devices constitute instrumentalities of the criminal activity.

117. In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Premises**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## IV.   DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA.

118. As described in Attachment B, this application seeks permission to search for records that might be found in or on the **Subject Premises**, in whatever form they are found, including data stored on computer, cellular telephone, tablet, or other digital storage

device, such as a thumb drive, CD-ROM, DVD, Blu Ray disk, memory card, or SIM card (collectively, "electronic storage media"). Thus, the warrant applied for would authorize the seizure of all electronic storage media found in or on the **Subject Premises** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

119.   *Probable cause.* Your Affiant submits that if electronic storage media are found in or on the **Subject Premises**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

a.     Your Affiant knows that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic storage media is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.     Based on my knowledge, training, and experience, your Affiant knows that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c. Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

e. ARROYO and LOMBARDI use their cellular telephones on a near-constant basis to communicate with one another and with prospective firearms purchasers, sellers, and manufacturers. They use text messages, cellular telephone calls, and voicemails to conduct their firearms transactions.

f. ARROYO has taken his cellular telephone with him on travel outside of Arizona during which travel he has purchased firearms. ARROYO has also taken his cellular telephone with him into Mexico several times in 2021, 2022, and 2023.

g. ARROYO and LOMBARDI maintain online accounts with firearms auctions sites such as gunbroker.com and armslist.com. They have repeatedly used these websites to purchase and sell firearms. They have both linked their cellular telephone numbers to their accounts on these websites.

h. ARROYO and LOMBARDI maintain email accounts that can be accessed through their computers, laptops, and or cellular telephones. They have used those email accounts to communicate with firearms purchasers, sellers, and manufacturers.

120.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be found on any electronic storage media located in or on the **Subject Premises** because:

      a.    Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      b.    As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while

31

executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

32

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

121.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because:

a.      *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Because the warrant calls for forensic electronic evidence, it is exceedingly likely that it

33

will be necessary to thoroughly examine electronic storage media to obtain evidence. Electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.    *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

      c.    *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

    122.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

    123.   Because several people share certain of the **Subject Premises** as a residence, it is possible that the **Subject Premises** will contain electronic storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant

could be found on any of those electronic storage media, the warrant applied for would permit the seizure and review of those items as well.

## V.   CONCLUSION

124.   Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy); 922(a)(1)A) (Dealing firearms without a license); 924(a)(1)(A) (False statement in the purchase of a firearm); 924(n) (Travel into or within the U.S. with intent to violate § 922(a)(1)(A)); 554 (Smuggling goods from the United States); and 1956(a)(1) (Laundering of monetary instruments), are likely to be found at the **Subject Premises**, which are further described in Attachments A-1 through A-8.

125.   Your Affiant further submits that there is probable cause to believe that the **Subject Assets** are subject to seizure pursuant to 18 U.S.C. §§ 981(b), 982(b)(1), 3051(b), 21 U.S.C. § 853(e) and (f), and 28 U.S.C. § 2461(c), because they are property, real or personal, which constitute or are derived from proceeds traceable to a specified unlawful activity, including a violation of 18 U.S.C. § 924(n) (Travel into or within the U.S. with intent to violate § 922(a)(1)(A)), and are property, real or personal, involved in a transaction or attempted transaction in violation of a money laundering statute, including 18 U.S.C. § 1956(a)(1) (Laundering of monetary instruments).

_____
Special Agent P. Sean Sander, ATF

Subscribed electronically and sworn to me telephonically this 5th day of April, 2023 @4:54pm

_____
HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge